DOOLEY *v.* CITY OF DETROIT.

POINDEXTER *v.* SAME.

1. TAXATION—CONSTITUTIONAL LAW—INCOME TAX.

  The Constitution authorizes specific, as well as ad valorem taxes, but does not otherwise explicitly authorize the legislature or cities to impose income taxes, nor does it designate any specific taxes included in its general grant (Const 1908, art 10, §§ 3, 4).

2. SAME—INCOME TAXES.

  Generally, income taxes are excises, not property taxes.

3. SAME—COMPARISON OF INCIDENCE OF TAXATION ON INCOME AND PROPERTY.

  The incidence of a tax on income differs from that of a tax on property as neither is dependent upon the possession by the taxpayer of the subject of the other, since the taxpayer's income may be taxed, although he owns no property, and his property may be taxed, although it produces no income; income being taxed but once, and the same property recurrently.

4. SAME—GOVERNMENTAL BENEFITS—TAX ON INCOME AND PROPERTY.

  The tax on income and the tax on property are predicated upon different governmental benefits; protection offered to the property in one state not being extended to the receipt and enjoyment of income from it in another.

REFERENCES FOR POINTS IN HEADNOTES

[1]  27 Am Jur, Income Taxes § 18; 51 Am Jur, Taxation § 72.
[2]  27 Am Jur, Income Taxes §§ 2, 16.
[5, 9, 15]  27 Am Jur, Income Taxes § 3.
[6, 7]  51 Am Jur, Taxation §§ 33–37.
[8]  27 Am Jur, Income Taxes §§ 2, 19.
[10]  37 Am Jur, Municipal Corporations § 102 *et seq.*
[11, 12, 14, 16]  38 Am Jur, Municipal Corporations § 381 *et seq.*
[13]  50 Am Jur, Statutes § 217 *et seq.*
[17]  27 Am Jur, Income Taxes § 20.
[18]  27 Am Jur, Income Taxes § 189 *et seq.*

5. SAME—HOME-RULE CITY—INCOME TAX.

The income tax levied by home-rule city "on all salaries, bonuses, wages, commissions, dividends, interest, net profits from rentals, capital gains less capital losses, and other income of residents of the city; * * * and on the income of nonresidents of the city * * * on salaries, bonuses, wages, and other compensation for work done in the city, * * * services rendered in the city, * * * and on the net profits from rentals received from property located in the city, * * * and capital gains less capital losses from the sale of real and tangible personal property located in the city; * * * and on the net profits from all businesses, professions, or other activities conducted in the city * * * by residents of the city; * * * and on the net profits from all businesses, professions, or other activities conducted in the city * * * by nonresidents; and on the net profits earned by all corporations as a result of work done, services rendered, and other business conducted in the city" *held*, an excise tax authorized by the home-rule act (Const 1908, art 10, §§ 3, 4; CL 1948, § 117.4i, as amended by PA 1957, No 131; Detroit Ordinance No 694–F, ch No 84).

6. SAME—EXCISE.

An excise tax is any tax which is neither a poll tax nor a property tax and embraces every form of burden not laid directly upon persons or property.

7. SAME—EXCISE.

An excise is a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege.

8. SAME—INCOME RENTALS.

An income tax is not a tax upon property even as to the taxation of income from rentals of real property.

9. SAME—CITY INCOME TAX—MUNICIPAL SERVICES AND PROTECTION.

Home-rule city income tax upon residents' total income and upon income earned or received by a nonresident in the city or from property located there fairly reflects the extent to which municipal services and protection are enjoyed by the taxpayer (CL 1948, § 117.4i, as amended by PA 1957, No 131).

10. MUNICIPAL CORPORATIONS—HOME RULE—CONSTITUTIONAL LAW.

The home-rule provisions of the Constitution consigned broad general powers of government and almost exclusive rights in the conduct of their affairs to those units of government likely to be best informed of local needs and best able to satisfy them, subject to overriding legislative restraint to secure con-

servative action on the part of those responsible for the conduct of such affairs (Const 1908, art 8, §§ 20–25; CL 1948, § 117.4j).

11. SAME—HOME-RULE CITIES—TAXATION.

Home-rule cities do not possess plenary powers and may not, absent legislative grant, assume powers not essential to local self-government, but such restriction does not require that every power exercised by a city, such as the imposition of a new tax, be specifically delegated by legislative grant where there is delegated the power to impose taxes of a designated generic kind (CL 1948, § 117.4i, as amended by PA 1957, No 131).

12. SAME—CONSTITUTIONAL LAW—STATUTES—TAXATION—EXCISES— INCOME TAXES.

The legislative grant of power to a home-rule city to collect excises empowered such cities to seek municipal revenues by whatever excises the municipalities chose, such as an income tax, subject to the legislature's constitutionally ordained duty to limit their rate of taxation for municipal purposes (Const 1908, art 8, § 20; CL 1948, § 117.4i, as amended by PA 1957, No 131; Detroit Charter, title 3, ch 1, § 12 [m]; Detroit Ordinance No 694–F, ch No 84).

13. STATUTES—CONSTRUCTION—SUPREME COURT.

The local construction by a home-rule city of provisions of the home-rule city act does not preclude the Supreme Court from giving a different construction (CLS 1956, § 117.3, subd [g], as amended by PA 1960, No 14; CL 1948, § 117.4a).

14. TAXATION—HOME-RULE CITIES—AD VALOREM LIMITATION.

Provision of home-rule city act limiting rate of taxation in such city to 2% of the assessed value of the real and personal property in the city is a limitation which applies only to ad valorem taxes (Const 1908, art 8, § 20; CLS 1956, § 117.3, subd [g], as amended by PA 1960, No 14).

15. SAME—HOME-RULE CITY—INCOME TAX—ABSENCE OF LEGISLATIVE LIMITATION.

Provision of the Constitution that "the legislature shall provide by a general law for the incorporation of cities, and * * * shall limit their rate of taxation for municipal purposes" does not confine the legislature's imposition of limitations on home-rule cities' power to tax to ad valorem taxes, but the absence of legislative limitations upon a city's imposition of an excise does not invalidate an income tax imposed by a home-rule city

(Const 1908, art 8, § 20; CL 1948, § 117.4i, as amended by PA 1957, No 131; Detroit Charter, title 3, ch 1, § 12 [m]; Detroit Ordinance No 694–F, ch No 84).

16. SAME—HOME-RULE CITY—AD VALOREM TAXES.

Home-rule city act provision "that the subjects of taxation for municipal purposes shall be the same as for State, county and school purposes under the general law" is construed as applicable only to ad valorem taxes on property (CLS 1956, § 117.3, subd [f], as amended by PA 1960, No 14).

17. SAME—DUE PROCESS—INCOME—RESIDENTS.

A governmental unit, such as a home-rule city, which has the power to impose an income tax is not limited in taxation of the income of its residents to income from sources within the unit's borders by due process provisions of the State and Federal Constitutions (US Const, Am 14; Mich Const 1908, art 2, § 16; CL 1948, § 117.4i, as amended by PA 1957, No 131; Detroit Charter, title 3, ch 1, § 12 [m]; Detroit Ordinance No 694–F, ch No 84).

18. SAME—DUE PROCESS—INCOME—NONRESIDENTS.

Due process provisions of the State and Federal Constitutions were not violated by home-rule city by reason of its taxation of the income of nonresidents from local sources (US Const, Am 14; Mich Const 1908, art 2, § 16; CL 1948, § 117.4i, as amended by PA 1957, No 131; Detroit Charter, title 3, ch 1, § 12 [m]; Detroit Ordinance No 694–F, ch No 84).

19. COSTS—HOME-RULE CITY—INCOME TAX.

No costs are allowed in class suits by residents and nonresidents of home-rule city to declare invalid the city's ordinance imposing an income tax upon residents from whatever source and upon nonresidents from income having a local source (Const 1908, art 8, § 20; CL 1948, § 117.4i, as amended by PA 1957, No 131; Detroit Charter, title 3, ch 1, § 12 [m]; Detroit Ordinance No 694–F, ch No 84).

Appeal from Wayne; Fitzgerald (Neal), J. Submitted February 6, 1963. (Calendar Nos. 53, 54, Docket Nos. 49,973, 49,954.) Decided May 9, 1963.

Bill by John F. Dooley and 18 other prospective taxpayers, as a class action, against the City of Detroit, a municipal corporation, to declare illegal

and unconstitutional the city's income tax ordinance and to enjoin enforcement and collection against individuals who are not residents of the city but who receive salaries or remuneration for services therein. Harvey W. Moelke and 12 outlying and neighboring municipal corporations intervened as parties plaintiff.

Similar class action by Thomas L. Poindexter and Sophia D. Poindexter, residents and taxpayers within the City of Detroit, against Jerome P. Cavanagh, Mayor, and other city officials, with amendment adding City of Detroit as defendant.

Actions consolidated for hearing and on appeal. Decrees for defendants, dismissing both bills. Plaintiffs appeal. Affirmed.

*Richard D. Dunn* and *Thomas C. Mayer* ( *Platt & Platt, John H. Yoe,* and *Thomas P. Casey,* of counsel), for plaintiffs Dooley and others.

*Thomas L. Poindexter, in propria persona* (*Myer Miller, Ralph H. McIntyre, David I. Berris* and *Morris H. Berris,* of counsel), for plaintiff Poindexter and others.

*Robert Reese,* Corporation Counsel, *John H. Witherspoon, Edward M. Welch, Robert D. McClear,* and *John D. O'Hair,* Assistant Corporation Counsel, for defendants.

SOURIS, J. By today's decision we uphold the validity of Detroit's income tax ordinance.[1] The only

---

[1] Ordinance No 694–F, chapter No 84, adopted April 26, 1962. Its title fairly describes its scope:

"An ordinance imposing a specific income tax for general revenue purposes as an excise, on all salaries, bonuses, wages, commissions, dividends, interest, net profits from rentals, capital gains less capi-

other city in Michigan which previously had attempted to raise revenues for municipal purposes by taxing incomes was Saginaw, whose submission to electors of a proposal authorizing an income tax was declared invalid by this Court in 1952 in *House v. City of Saginaw*, 334 Mich 241, for failure of compliance with procedural requirements. The issues presented to us in this appeal are, therefore, issues of first impression.

In 1962, by ordinance adopted by its city council and approved by its mayor, Detroit imposed for municipal purposes a net income tax, at the rate of 1%, upon income earned and income received by residents and nonresidents of the city, such taxable income of nonresidents being limited, however, to income earned from work done, services rendered, or other business activities conducted in the city and to income received from sale or rental of real and tangible personal property located in the city. Before the ordinance could be implemented, 2 suits for declaratory and injunctive relief were instituted, 1 by residents and the other by affected nonresidents of the city. Both suits were class actions and other members of the respective classes were accorded opportunity to intervene. The suits were consolidated for hearing below, and later were ordered

tal losses, and other income of residents of the city of Detroit; and on the income of nonresidents of the city of Detroit from salaries, bonuses, wages, and other compensation for work done in the city of Detroit, services rendered in the city of Detroit, and on the net profits from rentals received from property located in the city of Detroit, and capital gains less capital losses from the sale of real and tangible personal property located in the city of Detroit; and on the net profits from all businesses, professions, or other activities conducted in the city of Detroit by residents of the city of Detroit; and on the net profits from all businesses, professions, or other activities conducted in the city of Detroit by nonresidents; and on the net profits earned by all corporations as a result of work done, services rendered, and other business conducted in the city of Detroit; requiring the filing of returns; providing for the administration, collection, enforcement, and withholding of said tax; establishing a board of review; and prescribing penalties for the violation of its provisions."

submitted together for appellate purposes. They were submitted to the chancellor upon stipulations of facts and comprehensive briefs, the chancellor ultimately upholding the validity of the tax and denying the injunctive relief sought. The tax has been collected by the city since July 1, 1962.

Plaintiffs' attacks upon the validity of the income tax ordinance are on 3 principal fronts. First, they contend that cities have not been granted necessary legislative authority to levy income taxes. Second, assuming that cities have been granted such authority, plaintiffs claim Detroit's income tax ordinance violates existing statutory tax rate limitations and restrictions claimed by them to be applicable to municipal income taxes as well as to ad valorem taxes on property. Finally, plaintiffs claim that the income tax ordinance denies them due process of law as guaranteed by our State and Federal Constitutions.

1. The Constitution of 1908 authorizes specific, as well as ad valorem taxes, article 10, §§ 3 and 4, but apart from such authorization, it does not explicitly authorize the legislature or cities to impose income taxes, nor does it designate any other specific taxes included in its general grant. For its statutory authority to impose its income tax, the city relies upon section 4i of the home-rule cities act, PA 1909, No 279, as amended (CL 1948, § 117.4i, subd [1], as amended by PA 1957, No 131 [Stat Ann 1961 Cum Supp §5.2082, subd (1)]). It reads, in its entirety:

"Each city may in its charter provide:
"(1) For laying and collecting rents, tolls and excises."

Pursuant thereto, Detroit's charter, title 3, chapter 1, §12(m), delegates to its common council author-

ity "to provide for the laying and collecting of rents, tolls, and excises."[2]

Plaintiffs do not claim that the legislature exceeded its powers under article 10, §§ 3 and 4 by permitting cities in section 4i of the home-rule cities act to lay and collect excises. Instead, they claim that income taxes are not excises and, in the alternative, that even if such taxes properly may be classified as excises, a far more detailed legislative grant of express authority to tax incomes is required before a city can claim the right to do so.

It is our conclusion that Detroit's income tax is an excise and that the statutory authority relied upon to support its levy is legally sufficient. There was a time in the recent history of this nation when respected authorities insisted that income is property, at least for some purposes, and that a tax upon net income is thereby a property tax subject to at least some of the constitutional limitations imposed upon such taxes. See *Pollock* v. *Farmers' Loan & Trust Company* (1895), 158 US 601 (15 S Ct 912, 39 L ed 1108); see, also, E. Blythe Stason, "The Fifteen Mill Tax Amendment Limitation," 31 Mich L Rev 371, 379 (1933). However, contrary views were early expressed, as Dean Stason acknowledged in his article. *Ludlow-Saylor Wire Co.* v. *Wollbrinck* (1918), 275 Mo 339 (205 SW 196); *Hattiesburg Grocery Company* v. *Robertson* (1921), 126 Miss 655 (89 So 369, 25 ALR 755); *Sims* v. *Ahrens* (1925), 167 Ark 557 (271 SW 720); and *Featherstone* v. *Norman* (1930), 170 Ga 370 (153 SE 58, 70 ALR 449). Today, however, it is generally said that income taxes are excises and not property taxes. See 16 McQuillin, Municipal Corporations (3d ed), § 44.193; Brown, "The Nature of the Income Tax," 17 Minn L Rev 127; and *Hale* v.

---

[2] Detroit, Municipal Code, 1954, charter section, p 24.—REPORTER.

*Iowa State Board of Assessment and Review* (1937), 302 US 95 (58 S Ct 102, 82 L ed 72). Mr. Justice Cardozo, in the *Hale Case,* 104, 105, noted that "many, perhaps most, courts hold that a net income tax is to be classified as an excise." He also took occasion, at p 107, to repeat the supreme court's earlier clarification of the *Pollock* decision by referring to and quoting from *Brushaber* v. *Union Pacific R. Co.* (1916), 240 US 1 (36 S Ct 236, 60 L ed 493, LRA 1917D, 414, Ann Cas 1917B, 713):

"In line with that conception of the *Pollock Case* is *Brushaber* v. *Union P. R. Co. supra,* where the court pointed out (240 US at pp 16, 17), that 'the conclusion reached in the *Pollock Case* did not in any degree involve holding that income taxes generically and necessarily came within the class of direct taxes on property,' but that to the contrary such taxes were enforceable as excises except to the extent that violence might thus be done to the spirit and intent of the rule governing apportionment."

Significantly, Justice Cardozo, at pp 106, 107, also referred to *New York, ex rel. Cohn,* v. *Graves* (1937), 300 US 308 (57 S Ct 466, 81 L ed 666, 108 ALR 721), decided at the term preceding decision in *Hale.* In *Cohn,* where it was claimed New York's income tax as applied to a resident's income from rents of land and interest on bonds was in substance and effect a tax on property, Mr. Justice Stone wrote for the Court, at p 314, that:

"Neither analysis of the 2 types of taxes, nor consideration of the bases upon which the power to impose them rests, supports the contention that a tax on income is a tax on the land which produces it. The incidence of a tax on income differs from that of a tax on property. Neither tax is dependent upon the possession by the taxpayer of the subject of the other. His income may be taxed, although he owns no property, and his property may be taxed, although

it produces no income. The 2 taxes are measured by different standards, the one by the amount of income received over a period of time, the other by the value of the property at a particular date. Income is taxed but once; the same property may be taxed recurrently. The tax on each is predicated upon different governmental benefits; the protection offered to the property in one state does not extend to the receipt and enjoyment of income from it in another."

More recent decisions from other jurisdictions in which courts have characterized income taxes as excises are: *Reynolds Metal Co.* v. *Martin* (1937), 269 Ky 378 (107 SW2d 251); *Vilas* v. *Iowa State Board of Assessment and Review* (1937), 223 Iowa 604 (273 NW 338); *Monteith Brothers Co.* v. *Department of Treasury of Indiana* (1939), 215 Ind 428 (19 NE2d 1010); *Forrester* v. *Culpepper* (1942), 194 Ga 744 (22 SE2d 595); *Herman* v. *Mayor and City Council of Baltimore* (1947), 189 Md 191 (55 A2d 491, 173 ALR 1310); *Carter Carburetor Corp.* v. *City of St. Louis* (1947), 356 Mo 646 (203 SW2d 438); *Gross Income Tax Division* v. *Bartlett* (1950), 228 Ind 505 (93 NE2d 174), appeal dismissed, 340 US 924 (71 S Ct 499, 95 L ed 667); *Canary* v. *Oklahoma Tax Commission* (Okla 1956), 295 P2d 281; *California Company* v. *State of Colorado* (1959), 141 Colo 288 (348 P2d 382); and *Central Lincoln People's Utility District* v. *Stewart* (1960), 221 Or 398 (351 P2d 694).

In this State we have never before reached the ultimate question whether an income tax is an excise. In *House* v. *City of Saginaw, supra,* as noted above, our decision was based upon a procedural flaw in submission to the people of a proposal to amend the city's charter to provide for a city income tax and, therefore, it was unnecessary even to consider the nature of the tax proposed. However, in at least

1 decision of this Court we determined that a tax on income, the Federal income tax, was not a tax on property. In *Park Building Co.* v. *George P. Yost Fur Co.*, 208 Mich 349, a lessee covenanted to pay all of lessor's taxes upon the leased "premises," "all buildings and improvements thereon," "the leasehold estate" and "the reversionary estate." The lessor claimed the covenant required lessee to pay all Federal income taxes assessed against the lessor on account of rentals received under the lease. The Court carefully considered the nature of the Federal income tax with reference to its impact upon rentals received by the lessor and concluded that it was a personal tax against him, in no sense a property tax upon the leased premises or the estate named in the covenant. We did not characterize the tax as an excise, but concluded only that it was not a property tax. Our opinion was relied upon in *Young* v. *Illinois Athletic Club*, 310 Ill 75, 82 (141 NE 369, 30 ALR 985), a case presenting essentially the same issue for determination, to support its holding, at pp 80, 81, that:

"An income tax is not similar to other forms of taxation, since it is not imposed upon property or business but upon the proceeds arising therefrom. Black on Income and Other Federal Taxes, § 1. An income tax is an assessment upon the income of the person and not upon any particular property from which that income is derived."

We, in turn, cited and quoted with approval the last sentence of the foregoing quotation from *Young* v. *Illinois Athletic Club* in *Shivel* v. *Kent County Treasurer*, 295 Mich 10, 19. This Court has never adopted the contrary view, presently held by a diminishing minority of the courts in this country, that taxes upon income are property taxes.

Our decision today,—that not only are such taxes on income not taxes on property, but that they are

excises,—is based not alone upon the impressive weight of authority from other jurisdictions, but also upon the persuasive reasoning of the courts which have preceded us in reaching this conclusion. Examination of many of the generally accepted definitions of excises, including our own, convinces us that the correct classification of Detroit's income tax is as an excise.

Excises have been variously defined, sometimes in very general language and sometimes in language more specific. In 51 Am Jur, Taxation, § 24, it is said that:

"Taxes fall naturally into 3 classes, namely, capitation or poll taxes, taxes on property, and excises. In general, it may be said that all taxes fall into one or the other of the foregoing classes, any exaction which is clearly not a poll tax or a property tax being an excise."

And at section 33, it is said:

"In its modern sense an excise tax is any tax which does not fall within the classification of a poll tax or a property tax, and embraces every form of burden not laid directly upon persons or property. The affirmative definitions of excise or excise tax found in the later decisions exhibit some variety in phraseology."

See, also, 16 McQuillin, Municipal Corporations (3d ed), § 44.190.

Our own decisions offer some assistance. For instance, in a line of decisions determining the nature of our corporate franchise tax,[3] beginning with *Union Steam Pump Sales Co.* v. *Secretary of State,* 216 Mich 261, and including *In re Truscon Steel Co.,* 246 Mich 174; *In re Detroit Properties Corp.,* 254 Mich 523; *Udylite Corp.* v. *Corporation & Securities*

[3] PA 1921, No 85, as amended, CL 1948 and CLS 1956, § 450.301 *et seq.,* as amended (Stat Ann 1961 Cum Supp § 21.201 *et seq.*).

*Commission,* 319 Mich 1; and *Chicago, Duluth & Georgian Bay Transit Co.* v. *Corporation & Securities Commission,* 319 Mich 14, we held that the corporate franchise tax was an excise tax on the franchise to do business as a corporation within the State. In support, we relied, first in *Union Steam Pump* (p 264) and in the other cases cited, upon the broad definition of an excise, which we accepted, found in 26 RCL, Taxation, § 209, at p 236:

"An excise is a tax imposed upon the performance of an act, the engaging in an occupation, or the enjoyment of a privilege."

We have noted our own prior decision, *Park Building Co.* v. *George P. Yost Fur Co., supra,* in which we concluded, from an analysis of the Federal income tax, that a tax on income was not a tax upon property even as to the taxation of income from rentals of real property. The incidence of Detroit's income tax is essentially the same as the Federal tax, both being taxes upon net income from the performance of labor or the rendition of services and from the use of capital, including income from the sale or rental of real and tangible personal property. We see no valid basis for concluding that the municipal income tax, any more than the Federal income tax, is a tax on property. See *Brushaber* v. *Union Pacific R. Co., supra, New York, ex rel. Cohn,* v. *Graves, supra;* and *Hale* v. *Iowa State Board of Assessment and Review, supra.* Having so concluded, and there being no rational basis to claim that the tax we consider is a capitation tax or poll tax, by such process of elimination we can conclude that the tax we consider must, therefore, be an excise. 51 Am Jur, Taxation, §§ 24 and 33, quoted *supra.*

But, we would prefer to rest our conclusion upon our own definition of the term "excise," adopted from Ruling Case Law, *supra.* What Detroit has done

is to charge part of the cost of municipal government to residents who earn income from whatever source and to those who earn or receive income in Detroit or from real or tangible personal property located in Detroit. Put another way, Detroit imposes its excise upon residents and those who earn or receive such income in or from Detroit for the privilege of enjoying the municipal services it performs for them and the protection it provides to them and their property. Furthermore, it is not unreasonable to assume that a resident's total income and the amount of income earned or received by a nonresident in Detroit or from Detroit property, the basis upon which the amount of tax due is determined, fairly reflects the extent to which municipal services and protection are enjoyed by the taxpayer.

Having determined that Detroit's income tax is not a tax upon property, but is, instead, an excise, we turn now to consideration of plaintiffs' claim that, even so, the legislative grant to home-rule cities to lay and collect excises is not sufficiently specific to authorize such income tax.

By our Constitution of 1908 cities and villages were given a substantially more important role in the governmental life of our State than previously they had played. Until 1908, municipal corporations exercised only such powers as were expressly granted to them by the legislature in very much the same manner that the powers of private corporations were limited. Article 15, Constitution of 1850. But new concepts of local government, concepts of "home rule," were incorporated in the Constitution of 1908, whereby very broad, general powers of government were consigned to those units of government likely to be best informed of local needs and best able to satisfy them,—subject, it is true, to overriding legislative restraint "to secure conservative action on the part of those to become responsible for the future

conduct of such affairs." Address to the People, Constitution of 1908.[4]

These concepts were embodied, in part, in sections 20 and 21 of article 8 of the then new Constitution:

"Sec. 20. The legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages; such

---

[4] The constitutional delegates of 1908 carefully spelled out in detail the radical change of which we speak. The following is a more complete extract from their Address:

"The foregoing provisions [sections 20 through 25 of article 8] * * * herein contained are designed to meet the modern conditions affecting municipal affairs; to authorize through appropriate legislation that which has heretofore been denominated 'home rule.'

"These provisions constitute a marked advance from the present constitutional provisions relating to cities and villages by doing away with the principle of classification and with special charters, granted and subject to amendment only by the State legislature. The purpose is to invest the legislature with power to enact into law such broad general principles relative to organization and administration as are or may be common to all cities and all villages, each city being left to frame, adopt and amend those charter provisions which have reference to its local concerns. The most prominent reasons offered for this change are that each municipality is the best judge of its local needs and the best able to provide for its local necessities; that inasmuch as special charters and their amendments are now of local origin, the State legislature will become much more efficient and its terms much shorter if the labor of passing upon the great mass of detail incident to municipal affairs is taken from that body and given into the hand of the people primarily interested.

"Under these provisions, cities and villages, as under the present Constitution, will remain subject to the Constitution and all the general laws of the State.

"The transfer of the powers of legislation from the State legislature to the people of the municipalities or their representatives necessitated the imposition of certain checks and prohibitions designed to secure conservative action on the part of those to become responsible for the future conduct of such affairs. So far as these checks and prohibitions have formerly been in the hands of the common councils, relating to franchises and the acquiring of public utilities, they are now made subject to the vote of 3/5 of the electors of the municipalities. The power to limit the rate of taxation and restrict the power of borrowing money and contracting debts is left to the legislature, as in the present Constitution, where it may be subject to such changes as may be made necessary by changing conditions. The right conferred to establish certain essential institutions involving public health and safety and to acquire the public utilities named, is conceived to be in line with the general privileges of home rule and one placing within the hands of municipalities, under the restrictions named, certain powers for potential competition with such corporations as from the very nature of the service required of them are monopolies."

general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts.

"Sec. 21.   Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this State."

In *Village of Kingsford* v. *Cudlip,* 258 Mich 144, a case involving the annexation of territory to a village, this Court, at p 148, measured the scope of these constitutional provisions by reference to their purpose thus:

"The purpose of these and other provisions which follow undoubtedly was to secure to cities and villages a greater degree of home rule than they formerly possessed.   The provision for a general law for their incorporation was intended to confer upon them almost exclusive rights in the conduct of their affairs, not in conflict with the Constitution or general laws applicable thereto."

This statement acknowledged judicially the general policy underlying the home-rule philosophy implicit in the considered sections of our present Constitution.   That general policy was likewise acknowledged legislatively by PA 1909, No 279, § 4, subd (s).   See, currently, CL 1948, § 117.4j (Stat Ann 1949 Rev § 5.2083), the third subdivision of which permitted each city to provide by its charter:

"(3) For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated

or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns subject to the Constitution and general laws of this State."

See, also, *Conroy* v. *City of Battle Creek,* 314 Mich 210; *City of Pontiac* v. *Ducharme,* 278 Mich 474; *City Commission of Jackson* v. *Hirschman,* 253 Mich 596; and *Gallup* v. *City of Saginaw,* 170 Mich 195. The point here made is that under our Constitution and our home-rule cities act, cities may exercise substantially greater powers essential to local self-government than they previously were allowed to exercise. That such powers are not without limit is, of course, conceded. Thus, cities may not, absent express legislative grant, exercise rate-making powers over public utilities,— powers not essential, or directly related to, the operations of local government. *City of Kalamazoo* v. *Titus,* 208 Mich 252, cited to us by plaintiffs. But, plaintiffs' reliance upon *City of Kalamazoo* v. *Titus* to support their suggestion, by analogy, that even today home-rule cities are limited exclusively to only those taxes expressly delegated by the Constitution or legislature is misplaced. That case properly stands for the proposition that home-rule cities do not possess plenary powers and may not, absent legislative grant, assume powers not essential to local self-government. It marks properly the outer boundaries of municipal powers, but it does not require, as plaintiffs suggest, that every power exercised by a city, such as the imposition of a new tax, be specifically delegated by legislative grant where there is delegated the power to impose taxes of a designated generic kind.

As we have seen, the legislature acting within the scope of its unquestioned power, authorized home-rule cities to lay and collect excises. Consistent with

the whole purpose of the home-rule cities act and the constitutional provisions pursuant to which it was enacted, the authority granted was in broad general terms, each city being left free to determine for itself what excises would best meet its local needs. The legislative choice of such a generic term seems clearly intended to grant cities full authority to seek municipal revenues by whatever excises the fertile minds of municipal officers fairly could devise, subject always, of course, to the legislature's constitutionally ordained duty to "limit their rate of taxation for municipal purposes" (article 8, § 20, Constitution of 1908).

Plaintiffs cite cases from other jurisdictions, in which municipal income taxes have been invalidated, in support of their claim that more explicit constitutional or legislative authority is required than is present in our Constitution and statutes. *Carter Carburetor Corporation* v. *City of St. Louis* (1947), 356 Mo 646 (203 SW2d 438), cited *supra,* and *City and County of Denver* v. *Sweet* (1958), 138 Colo 41 (329 P2d 441). Both the Missouri and Colorado constitutions, while granting cities a substantial measure of home rule, limited their taxing powers to only those granted them by their respective legislatures.[5] Absent grant of authority to cities to impose the municipal income taxes challenged in the cited cases, the courts struck down the taxes as beyond municipal powers. As we have noted earlier in this opinion, Michigan's legislature has granted home-rule cities the taxing power St. Louis and Denver were found to lack. This fact difference sufficiently distinguishes the Missouri and Colorado cases from our own. Other cases, in which municipal

[5] In *City and County of Denver* v. *Sweet,* decision was based upon a constitutional provision which the Colorado court interpreted to mean that only the legislature could levy income taxes and that such power could not be delegated by it.

income taxes were upheld, are cited by plaintiffs to demonstrate the constitutional and legislative detail they claim is necessary to support such taxes. *City of Louisville* v. *Sebree* (1948), 308 Ky 420 (214 SW2d 248); *Angell* v. *City of Toledo* (1950), 153 Ohio St 179 (91 NE2d 250); *Breitinger* v. *City of Philadelphia* (1950), 363 Pa 512 (70 A2d 640); and *Walters* v. *City of St. Louis* (1953), 364 Mo 56 (259 SW2d 377), affirmed (1954), 347 US 231 (74 S Ct 505, 98 L ed 660). It is perhaps sufficient to observe that substantial differences exist between our Constitution and statutes and the constitutions and statutes of the States from which plaintiff cites cases and that the "specificity" of their provisions does not, even logically, suggest that all States must indulge the same "specificity" in granting home-rule cities taxation powers. It may be noted, however, that in 1 of the cases so cited by plaintiffs, *Angell* v. *City of Toledo,* a municipal income tax was upheld absent *any* legislative authority therefor, but based only upon very broad constitutional grant of powers of local self-government not unlike our own. Article 8, § 21, Constitution of 1908, quoted above, and CL 1948, § 117.4j (Stat Ann 1949 Rev § 5.2083), also quoted above. See article 7, § 21, Constitution of 1963 for constitutional grant of municipal tax power effective January 1, 1964.

For the foregoing reasons we conclude that Detroit's income tax is an excise and that it is within the power of the city to impose such excise, the legislature having authorized home-rule cities to lay and collect excises.

2. We now turn to plaintiffs' claim that when Detroit's income tax revenues are added to the revenues from its ad valorem tax on property, its aggregate tax revenues exceed 2% of the assessed value of real and personal property in the city in alleged violation of section 3, subd (g), of the home-rule

cities act, CLS 1956, § 117.3, as amended by PA 1960, No 14 (Stat Ann 1961 Cum Supp § 5.2073). The parties stipulated that the revenue from the challenged tax when added to the revenue from the ad valorem tax to be imposed by the city for the 1962–1963 fiscal year (excluding the levy for debt services), would result in aggregate revenues in excess of the stated limit.

Article 8, § 20, of the Constitution of 1908 provides:

"The legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages; such general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts."

Section 3, subd (g), of the home-rule cities act provides:

"Each city charter shall provide:    *    *    *

"(g) For annually laying and collecting taxes in a sum not to exceed 2 per centum of the assessed value of all real and personal property in the city: Provided, That unless and until such charter shall provide for a different tax rate limitation, the governing body of every city is hereby authorized to levy and collect taxes for municipal purposes in a sum up to and including 1 per centum of the assessed value of all real and personal property in the city, subject to the provisions of section 1a of chapter 7 of Act No 202 of the Public Acts of 1943, as amended."[6]

It is the city's position, upheld by the chancellor, that the pertinent portions of both the constitutional and the statutory provisions quoted pertain only to ad valorem taxes on property and that other munic-

[6] Reference is to CLS 1956, § 137.1a (Stat Ann 1958 Rev § 5.3188 [45a]).—Reporter.

ipal tax revenues are not limited thereby. It claims that limitations upon the rate of taxation are generally held to apply only to property taxes as distinguished from excises or licenses, citing 1 Cooley on Taxation (4th ed), § 168, p 366, and 51 Am Jur, Taxation, § 140. Plaintiffs, on the other hand, point to the unqualified constitutional mandate to the legislature that it limit the rate of taxation by cities and urge us to construe the legislative language as a limitation upon a city's *aggregate* tax revenues from whatever tax source, the *measure* of such limitation being 2% of the assessed value of property in the city. They cite us to section 4-a of the act, CL 1948, § 117.4a (Stat Ann 1949 Rev § 5.2074), which limits the net bonded indebtedness of a city to 10% of the assessed value of all the real and personal property in the city, and to various provisions of Detroit's charter which plaintiffs claim demonstrate the city's own acceptance of the construction of the legislative language they urge upon us. It may be conceded, if only for the purpose of argument, that Detroit has in the past regarded the statute as an all-inclusive limitation upon its aggregate tax revenues, but such local construction of a statutory provision does not preclude our giving it a different construction. Likewise, while section 4-a of the act lends some support to plaintiffs' contention,—insofar as it appears that its reference to the assessed value of property in the city is as a measure by which net bonded indebtedness is limited,—it is not so clear that similar usage of those words in section 3, subd (g) requires our finding that it limits the city's aggregate tax revenues.

It is not at all inappropriate for the legislature to limit the bonded indebtedness of cities by reference to the assessed value of the real and personal property within their boundaries, just as it may have limited such indebtedness by reference to population

or, indeed, by a legislatively predetermined fixed maximum amount. Assessed value of property is a readily available standard, and an appropriate one to the extent it measures a city's capacity to repay bonded debt, for use as a limitation upon bonded indebtedness. On the other hand, assessed value of all of a city's property, whether productive of income or not, whether used or not, bears little or no relation to its residents' capacity to pay income taxes or any other excise, to say nothing of the taxpaying capacity of nonresidents a city properly may reach for such excise taxation. By the very nature of excises, the measure of which depends upon factors other than value, it is not reasonable to assume that a statutory limitation upon the rate of excise taxation would be tied to the assessed value of property. In fact, it is difficult to conceive of any single limitation which would apply rationally to all excises, there being so many with such varying characteristics. It is even more difficult, if not impossible, to conceive of a single limitation rationally applicable both to excise and to ad valorem taxes. Several courts from other jurisdictions have reached essentially the same conclusion in construing comparable statutory or constitutional limitations upon tax rates. See *Phoenix Assurance Co. of London* v. *Fire Department of City of Montgomery* (1898), 117 Ala 631 (23 So 843, 42 LRA 468),[7] and *State, ex rel. City of Fargo,* v. *Wetz* (1918), 40 ND 299 (168 NW 835, 5 ALR 731), cited to us by defendant city.

We have thus far considered only the applicability of the specific limitation of section 3, subd (g), of the home-rule cities act to excises and have concluded that such limitation applies only to ad valorem taxa-

---

[7] For the provisions of the Alabama constitution, comparable to the statutory limitation of section 3, subd (g), of our home-rule cities act, reference must be made, as it was in the *Phoenix* case, to *Hare* v. *Kennerly* (1888), 83 Ala 608, 612 (3 So 683).

tion. Although not essential to his decision, the chancellor found that article 8, § 20, Constitution of 1908, quoted above, likewise applies only to ad valorem taxation. We disagree. The constitutional language is unqualified by anything which would suggest such a restrictive construction. It requires the legislature by general law to limit cities' rate of taxation for municipal purposes. Absent any reference to suggest restriction of this mandate only to the rate of ad valorem taxation, it is our opinion that it requires the legislature to impose limitations upon the rates of all taxes levied by cities. To read this constitutional provision as did the chancellor, absent other provisions limiting or requiring the limitation of other than ad valorem municipal taxes, would permit cities to tax other than property without limit except that of municipal self-restraint. Such result would defeat the purpose of the constitutional provision as reflected in the 1908 constitutional convention delegates' Address to the People, quoted earlier at greater length in the margin:

"The transfer of the powers of legislation from the State legislature to the people of the municipalities or their representatives necessitated the imposition of certain checks and prohibitions designed to secure conservative action on the part of those to become responsible for the future conduct of such affairs.   *   *   *   The power to limit the rate of taxation and restrict the power of borrowing money and contracting debts is left to the legislature, as in the present constitution, where it may be subject to such changes as may be made necessary by changing conditions."

We observe in passing that article 7, § 21, of the Constitution of 1963, not yet effective, provides:

"The legislature shall provide by general laws for the incorporation of cities and villages. Such laws shall limit their rate of ad valorem property taxa-

tion for municipal purposes, and restrict the powers of cities and villages to borrow money and contract debts. Each city and village is granted power to levy other taxes for public purposes, subject to limitations and prohibitions provided by this Constitution or by law."

The second sentence is expressly applicable only to ad valorem taxes on property, the rate of which the legislature is required to limit. However, by the last sentence other taxes cities and villages are empowered by the new Constitution to levy are subject to limitations and prohibitions imposed by the legislature as well as by the Constitution itself.

Failure of the legislature to comply fully with the provisions of present article 8, § 20, to the extent there is no legislative limit upon the right of cities to impose excises, does not invalidate Detroit's income tax. Legislative limitations may be imposed at any time. Constitutionally ordained powers of home-rule cities cannot be allowed to be wholly thwarted by failure of the legislature to comply with its own duty to impose limitations upon such powers by general law.

Somewhat related to the foregoing contention of plaintiffs is their claim that section 3, subd (f), of the home-rule cities act, CLS 1956, § 117.3, as amended by PA 1960, No 14 (Stat Ann 1961 Cum Supp § 5.2073), which provides:

"That the subjects of taxation for municipal purposes shall be the same as for State, county and school purposes under the general law,"

bars municipal income taxes because income is not the subject of taxation for State, county, and school purposes.

As we have noted above, the 1908 Constitution and the home-rule cities act adopted in obedience thereto, granted broad powers to cities, including the widest

possible range of taxing powers, subject only to such limitations as the legislature by general law chose to impose. Having so concluded, it makes no sense to say that by another section of the same act, section 3, subd (f), the legislature intended to prohibit all municipal taxes except such as the State, counties, and school districts are authorized to impose. It is our opinion that, like the next succeeding subsection, section 3, subd (g), discussed above, section 3, subd (f), applies only to ad valorem taxes on property and is designed to provide a unitary system of taxation and exemption from taxation of property throughout the State by all taxing units of government. It is not insignificant to us that section 3, subd (f), and section 3, subd (g), are and, since their rearrangement by the amendment of PA 1929, No 126, have been linked together in the same statutory section. Both, in our opinion, apply only to ad valorem taxes on property.

3. Plaintiffs' final attack upon Detroit's income tax ordinance is based upon the bare assertion that it violates their due process rights guaranteed by the State and Federal Constitutions. Article 2, § 16, Constitution of 1908 and Fourteenth Amendment to the United States Constitution. Their claim seems to be that the city may not tax its residents' activities which occur beyond its boundaries, nor may it tax nonresidents of the city for working or otherwise carrying on commercial activities within the city in the exercise of rights the city cannot prohibit. The claim misconceives the nature of the tax. As we have noted above, Detroit imposes its excise upon residents and others who earn or receive income in Detroit or from real or tangible personal property located in Detroit, for the privilege of enjoying the municipal services the city performs for them and the protection it provides to them and their property. We have also noted that the income basis for the

tax reasonably may be assumed to reflect fairly the extent to which such municipal services and protection are enjoyed by the taxpayer.

Other courts have considered the claims suggested by plaintiffs and have rejected them where, as here, the tax bears some relation to the services, protection and other privileges provided by the taxing unit and enjoyed by the taxpayer. The power to reach a citizen's income earned beyond the borders of the United States has been recognized in the Federal government in *Cook* v. *Tait* (1924), 265 US 47 (44 S Ct 444, 68 L ed 895). The State's power to reach a resident's income from sources beyond its borders was affirmed in *Lawrence* v. *State Tax Commission of Mississippi* (1932), 286 US 276 (52 S Ct 556, 76 L ed 1102, 87 ALR 374). No reason has been suggested to us for denying such power to cities. See *City of Springfield* v. *Kurtz* (1951), Ohio Court of Appeals, Clark County, 65 Abs 593 (104 NE2d 64).

As to nonresidents, see *Shaffer* v. *Carter* (1920), 252 US 37 (40 S Ct 221, 64 L ed 445), and *Travis* v. *Yale & Towne Manfg. Company* (1920), 252 US 60 (40 S Ct 228, 64 L ed 460), where States were recognized to have the power to tax nondiscriminatorily a nonresident's income earned within the taxing State, and *Angell* v. *City of Toledo, supra,* where the court concluded that a city could tax such nonresident's income from local sources. See, also, *Kiker* v. *City of Philadelphia* (1943), 346 Pa 624 (31 A2d 289). And see our own recent discussion of the due process guarantees, with reference to the constitutional applicability of Michigan's business activities tax to foreign corporations engaged in interstate commerce in Michigan. *Armco Steel Corporation* v. *Department of Revenue,* 359 Mich 430, 450.

We are not persuaded that plaintiffs have been deprived of any due process rights guaranteed by

either our State Constitution or the Federal Constitution.

Affirmed. No costs, there being presented public questions involving construction of an ordinance, statutes, and the Constitution.

CARR, C. J., and DETHMERS, KELLY, BLACK, KAVANAGH, SMITH, and O'HARA, JJ., concurred.