AIRLINES PARKING, INC v WAYNE COUNTY

Docket No. 98890. Argued April 11, 1996 (Calendar No. 2). Decided
July 16, 1996. Rehearing denied 453 Mich 1204.

Airlines Parking, Inc., brought an original action in the Court of
Appeals pursuant to Const 1963, art 9, § 32 against the City of Rom-
ulus, Wayne County, and the State of Michigan, contending that the
Airport Parking Tax Act is a local tax subject to § 31 of the Headlee
Amendment that prohibits a local tax increase or the imposition of
a new local tax without a majority vote of the qualified electors of
a local governing unit. The Court, D. E. HOLBROOK, JR., P.J., and
SAWYER and NEFF, JJ, in unpublished orders, granted the defend-
ant's motion for summary disposition (Docket No. 167321). The
Supreme Court remanded the case for an explanation of the rea-
sons for denying the plaintiff's motion for rehearing. 447 Mich 985
(1994). On remand, the Court of Appeals, in an unpublished order,
stated that the plaintiff's claim was untimely and concluded that
the airport parking tax is a state tax. The Supreme Court held the
case in abeyance pending decision in *Taxpayers Allied for Consti-
tutional Taxation v Wayne Co*, 450 Mich 119 (1995). After review,
and in light of that case, leave to appeal was granted to the plain-
tiff, limited to whether the tax was unconstitutional under the
Headlee Amendment, art 9, § 31.

In an opinion by Justice BOYLE, joined by Chief Justice BRICKLEY,
and Justices RILEY, MALLETT, and WEAVER, the Supreme Court *held*:

The airport parking tax is a state tax authorized by state law,
administered, collected, and distributed by the state. The Wayne
County regional airport benefits the entire population of this state.
Though the tax is currently allocated to Wayne County and Romu-
lus, the language of the statute does not limit payments solely to
these localities. The tax is not a local tax levied under the Headlee
Amendment and, thus, is not subject to a vote by a majority of the
electors of either of these local governments.

1. The Airport Parking Tax Act levies an excise tax on each
parking transaction at an airport parking facility located within five
miles of a regional airport facility, defined as a facility that services
four million or more annual enplanements. Detroit Metropolitan
Airport currently is the only airport in the state that fits the defini-

tion, and the tax is collected, distributed by the state, and appropriated by legislative act to Wayne County and Romulus, where the airport is located.

2. The Headlee Amendment establishes tax limitations on state and local governments and prohibits tax increases by state and local governments without direct voter approval. The airport parking tax is not a local tax, but is an excise tax, enacted by the Legislature and administered by the state. It requires a continuing appropriation from year to year, and revenues are subject to redirection by the Legislature. Its language is not exclusive, and its application is not limited to any one location. The fact that certain individuals benefit from an appropriation does not necessarily imply that the appropriation is lacking a public purpose or that the tax has only a local purpose.

3. The claim that the recipient of the tax proceeds, rather than the entity levying the tax, determines whether the tax is state or local is refuted by the structure of the amendment and its purpose. Thus, accepting plaintiff's argument that the end-user recipient of tax proceeds determines whether a tax is state or local would have the negative effect of allowing the Legislature to classify taxes it appropriates to local units of government as local taxes and circumventing the state taxing cap, something the state is plainly precluded from doing under the Headlee Amendment.

Affirmed.

Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that the Legislature may not impose a tax on a specific activity in a specific location in order to generate revenue to assist financially the specific county and the specific municipality in which that activity occurs. The Legislature's purpose in relieving financially distressed Wayne County is not reasonably related to imposing an excise tax on airport parking at private lots located in the Detroit Metropolitan Airport area. Thus, the Airport Parking Tax Act should be found to be unconstitutional under the Headlee Amendment, Const 1963, art 9, § 31, because it was levied without local voter approval.

*Philip A. Gillis* for the plaintiff.

*Miller, Canfield, Paddock & Stone* (by *Jay B. Rising* and *Carl H. von Ende*) and *Jennifer Granholm*, Corporation Counsel, for Wayne County.

*Cox, Hodgman & Giarmarco* (by *Stephen J. Hitchcock*) for the City of Romulus.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Ross H. Bishop*, Assistant Attorney General, for the State of Michigan.

BOYLE, J. We granted leave in this case to determine whether the Airport Parking Tax Act, 1987 PA 248, MCL 207.371 *et seq.*; MSA 7.559(101) *et seq.*, violates Const 1963, art 9, § 31.[1]

Specifically, we must determine whether the airport parking tax levied on Airlines Parking is a "local tax" and therefore subject to the section of the Headlee Amendment that prohibits a local tax increase or the imposition of a new local tax without a majority vote of the qualified electors of a local governing unit. We conclude that the airport parking tax is not a local tax and, therefore, does not violate Const 1963, art 9, § 31. Thus, we affirm the decision of the Court of Appeals.

I

Plaintiff, Airlines Parking, Inc., owns and operates an airport parking facility in Romulus, which is in Wayne County. The facility is located within five miles of Detroit Metropolitan Airport (Metro). Plaintiff brought an original action in the Court of Appeals[2]

---

[1] The Headlee Amendment is the popular name for Const 1963, art 9, §§ 25-34.

[2] An earlier dispute between the plaintiff and the Department of Treasury was the catalyst for the present case. Plaintiff was assessed penalties and interest by the Department of Revenue for several late payments of the airport tax, which had been due but not timely paid in January and February, 1988, and April, May, and June, 1989. Plaintiff disputed the charges and filed a petition with the Michigan Tax Tribunal on November 8, 1989, for redetermination of the delinquent payments.

The Department of Treasury responded to the petition with a motion for summary disposition. On March 30, 1990, the Tax Tribunal granted the motion, finding that plaintiff failed to appeal the final determination of the

pursuant to Const 1963, art 9, § 32[3] against defend-
ants, the City of Romulus, the County of Wayne, and
the State of Michigan, contending that the tax is a
"local tax" subject to § 31 of the Headlee Amendment,
and therefore subject to prior approval by a majority
of local voters.

The Court of Appeals granted defendants' motion
for summary disposition and initially granted plain-
tiff's motion for rehearing, but, after further review,
rejected the motion. Plaintiff filed an application for
leave to appeal with this Court. We retained jurisdic-
tion and remanded the case to the Court of Appeals
for an explanation of the reasons for denying the
plaintiff's rehearing motion. 447 Mich 985 (1994). In
response, the Court of Appeals stated that plaintiff's
claim was untimely and alternatively rejected its con-
tention that the tax was a "local tax" under the cur-
rent constitution.[4]

When the case returned to this Court, we held it in
abeyance pending a decision in *Taxpayers Allied for
Constitutional Taxation v Wayne Co*, 450 Mich 119;
537 NW2d 596 (1995). After review, and in light of
that case, we granted leave to appeal limited to the

---

tax assessment in a timely manner. Plaintiff appealed, and the Court of
Appeals upheld the Tax Tribunal decision, *Airlines Parking, Inc v Dep't of
Treasury*, unpublished opinion per curiam of the Court of Appeals, issued
May 21, 1992 (Docket No. 129276), affirming the holding and noting that
plaintiff did not take advantage of the two distinct opportunities available
for administrative review under the statutory scheme.

[3] Any taxpayer of the state shall have standing to bring suit in the
Michigan State Court of Appeals to enforce the provisions of Sec-
tions 25 through 31, inclusive of this Article and, if the suit is sus-
tained, shall receive from the applicable unit of government his
costs incurred in maintaining such suit.

[4] Unpublished order, entered December 15, 1994 (Docket No. 167321).

issue whether the airport tax was an unconstitutional tax under the Headlee Amendment, art 9, § 31.

II

A. THE STATUTE

The Airport Parking Tax Act, MCL 207.371 *et seq.*; MSA 7.559(101) *et seq.*, in pertinent part provides:

> There is hereby levied upon and shall be collected from a person engaged in the business of providing an airport parking facility an excise tax at the rate of 30% of the amount of the charge for the transaction. [MCL 207.373; MSA 7.559(103).]

The statute levies an excise tax on each parking transaction[5] at an airport parking facility[6] located within five miles of a regional airport facility, which is defined by the act as an airport that services four million or more annual "enplanements."[7] Metro is currently the only airport in the state that fits the definition of a regional airport facility. The tax is collected, distributed by the state, and appropriated by legisla-

---

[5] " 'Transaction' means the parking, storing, housing, or keeping of a motor vehicle for consideration." MCL 207.372(i); MSA 7.559(102)(i).

[6] "Airport parking facility" means an area, space, garage, parking structure, or other facility upon or in which motor vehicles are parked, stored, or housed for a consideration and that is located within the boundaries or within 5 miles of the boundaries of a regional airport facility. However, an airport facility does not include publicly owned metered spaces or a facility that is leased or rented exclusively for the use of employees of employers located within the boundaries or within 5 miles of the boundaries of a regional airport facility. [MCL 207.372(a); MSA 7.559(102)(a).]

[7] " 'Regional airport facility' means an airport that services 4,000,000 or more enplanements annually." MCL 207.372(h); MSA 7.559(102)(h). This definition involves air traffic volume, the number of enplanements required before the airport parking tax would apply.

tive act for Wayne County and Romulus, the county and city in which the airport is located.

The parties have not argued nor do we find ambiguity in the statute. Plaintiff does not contend that Const 1963, art 4, § 29 is relevant to his claim and has not argued or briefed this issue.[8] The only issue before us is whether the tax violates art 9, § 31 of the Headlee Amendment.

### B. CONSTITUTION

The Headlee Amendment was "part of a nationwide 'taxpayers revolt' . . . to limit legislative expansion of requirements placed on local government, to put a freeze on what they perceived was excessive government spending, and to lower their taxes both at the local and the state level." *Durant v State Bd of Ed*, 424 Mich 364, 378; 381 NW2d 662 (1985). For present purposes, we observe that Headlee establishes tax limitations on state and local governments and pro-

---

[8] *Avis Rent-A-Car System, Inc v City of Romulus*, 400 Mich 337; 254 NW2d 555 (1977), was decided before the effective date of the Headlee Amendment under a constitutional provision not at issue here. Additionally, *Avis* is distinguishable from the present case. In *Avis*, 1953 PA 189 provided for a tax on leased property as if it were real property. The statute included an exemption from the tax if the leased real property was used in connection with an airport concession. The issue in *Avis* concerned a legislative amendment of the earlier statute, requested by the City of Romulus, to exclude from the tax exemption airport concessions in counties of over 1,000,000 population. *Id.* at 343. The Court held that the population classification did not bear a reasonable relationship to the purpose of the statute, quoting with approval the trial court's conclusion that "there is no correlation between the county in which an airport is located and the traffic which passes through the airport." *Id.* at 348. The amendment, in effect, allowed a local government to impose a selective local tax where the state had granted a state-wide legislative exemption from the tax. Unlike the tax in *Avis*, the airport parking tax is a state-imposed tax, applies to all qualified counties, classifies by volume of airport traffic, and does not allow selective application by local units of government.

hibits tax increases by both state and local governments without direct voter approval. Art 9, § 25.

Plaintiff asserts that the tax was levied in violation of the prohibition of art 9, § 31:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.[9]

Simply stated, a proposal by local government to levy a new tax or increase the rate of an extant tax beyond the limit imposed by law must be approved by a majority of the local voters.

In parallel fashion, Headlee controls the level of state taxation, limiting the total amount of taxes that may be imposed on state taxpayers in any fiscal year. This limit cannot "be changed without approval [of a] majority of qualified electors," and the Legislature is prohibited from imposing "taxes of any kind which,

---

[9] Section 31 further explains the taxing formula for local governmental units:

> If the definition of the base of an existing tax is broadened, the maximum authorized rate of taxation on the new base in each unit of Local Government shall be reduced to yield the same estimated gross revenue as on the prior base. If the assessed valuation of property as finally equalized, excluding the value of new construction and improvements, increases by a larger percentage than the increase in the General Price Level from the previous year, the maximum authorized rate applied thereto in each unit of Local Government shall be reduced to yield the same gross revenue from existing property, adjusted for changes in the General Price Level, as could have been collected at the existing authorized rate on the prior assessed value.

together with all other revenues of the state, federal aid excluded, exceed the revenue limit established in this section" of the amendment. Art 9, § 26.[10] It is undisputed that, if the airport tax is a state tax, the limits of § 26 of the Headlee Amendment have not been exceeded.

The amendment is built on the previously existing system, and the temporal reference point of the requirements and limitations imposed on state government is fiscal year 1978-79. Art 9, §§ 26 and 30. The temporal reference point for the limitation on local government here at issue is the date of ratification, November 7, 1978. In each instance, the language of the provisions is linked to the determination of which entity—the state or local government—imposes or levies the tax in question.[11] However, because it is at least theoretically possible that the state could levy a tax that was local in character, the entity imposing the tax in question may not conclusively resolve the Headlee question.

We find no reason in this case to conclude that the tax is a local tax. It is an excise tax, "a tax imposed

---

[10] The Headlee Amendment does not preclude the imposition of new state taxes, provided the additional revenue, together with other state revenues, does not exceed the Headlee specified state taxing caps.

[11] Local governments must, for purposes of local taxing, know which entity is levying tax. In addition to the question at issue in this case, there are other limitations on local taxes that do not arise if a tax is a state tax rather than local tax. Other questions of constitutional interpretation that have arisen in the context of the application of § 31 to local tax levies are not before the Court, and we make no determination regarding them other than to observe that, because the Headlee Amendment imposes additional controls, in effect building on an existing system of previously determined tax levels, the point of origin of the tax is central to its scheme. See *Bailey v Muskegon Co Bd of Comm'rs*, 122 Mich App 808; 333 NW2d 144 (1983), *Fahnenstiel v Saginaw*, 142 Mich App 46; 368 NW2d 893 (1985), *Smith v Scio Twp*, 173 Mich App 381; 433 NW2d 855 (1988), and *Saginaw Co v Buena Vista School Dist*, 196 Mich App 363; 493 NW2d 437 (1992).

upon . . . the engaging in an occupation." *Dooley v
Detroit*, 370 Mich 194, 206; 121 NW2d 724 (1963),
which the constitution authorizes the Legislature to
enact.[12] It is styled as a state tax, has the structural
attributes of a state tax, and serves a state purpose. It
was enacted by the Legislature and is administered by
the state. It is collected by the state treasury and
accounted for in the state budget. The funds are
deposited in the state treasury to the credit of the air-
port parking fund[13] and distribution is directed to
each qualified county[14] and city according to a statu-
tory formula.[15] The state retains all interest and penal-
ties from delinquent taxes. The statute requires a con-

---

[12] Art 9, § 3  allows "[t]he legislature [to] provide for alternative means
of taxation of designated real and tangible personal property in lieu of
general ad valorem taxation . . . . Every tax other than the general ad
valorem property tax shall be uniform upon the class or classes on which
it operates."

The excise tax is in contrast to an ad valorem tax, which is not at issue
in this case. For clarification purposes, an ad valorem tax is defined as a
tax levied on property or an article of commerce in proportion to its value
as determined by assessment or appraisal. See Black's Law Dictionary
(6th ed), p 51. "A basic distinction between an ad valorem property tax
and an excise tax is that the former is regarded as primarily *in rem* in
nature while the latter is regarded as *in personam* in nature." *Continental
Motors Corp v Muskegon Twp*, 376 Mich 170, 180; 135 NW2d 908 (1965).

[13] MCL 207.376;  MSA 7.559(106).

[14] " 'Qualified county' means a county that provides public services to a
regional airport facility." MCL 207.372(g);  MSA 7.559(102)(g).

[15] MCL 207.377(1),  (2);  MSA 7.559(107)(1),  (2),  in part, provides:

[O]n the first day of each month, the state treasurer shall make a
distribution from the fund to each qualified county . . . .

[O]n the first day of each month, the state treasurer shall make a
distribution from the fund to each city within which a regional air-
port facility is wholly located . . . . A distribution made under sub-
section (1) or (2) shall be deposited in the general fund of the city
or qualified county.

tinuing appropriation[16] from year to year, and reve-
nues are therefore subject to redirection by the
Legislature. *Michigan Ass'n of Cos v Dep't of Man-
agement & Budget*, 418 Mich 667; 345 NW2d 584
(1984).[17]

By contrast, local taxes are collected by local gov-
ernment, administered directly by that local entity,

---

[16] See § 1028 of 1989 PA 181 for the 1989-90 state fiscal year; 1990 PA
208, § 1028, for the 1990-91 state fiscal year; 1991 PA 114, § 1026, for the
1991-92 state fiscal year; 1992 PA 175, § 1024, for the 1992-93 state fiscal
year; 1993 PA 191, § 1023, for the 1993-94 state fiscal year; 1994 PA 288,
§ 1025, for the 1994-95 state fiscal year; and 1995 PA 158, § 920, for the
1995-96 state fiscal year. Each of these acts states:

> Revenue from the airport parking tax act, Act No. 248 of the Pub-
> lic Acts of 1987, being sections 207.371 to 207.383 of the Michigan
> Compiled Laws, is appropriated and shall be distributed in accor-
> dance with section 7 of Act No. 248 of the Public Acts of 1987,
> being section 207.377 of the Michigan Compiled Laws.

MCL 207.377; MSA 7.559(107) provides:

> (1) . . . [T]he state treasurer shall make a distribution from the
> fund to each qualified county in an amount equal to the total
> amount on deposit in the fund multiplied by a fraction the numera-
> tor of which is the population of that qualified county during the
> immediately preceding year and the denominator of which is the
> total population of all qualified counties during the immediately
> preceding year.
> (2) . . . [T]he state treasurer shall make a distribution from the
> fund to each city within which a regional airport facility is wholly
> located in an amount equal to 20% of the total amount on deposit
> in the fund minus the amount of revenue generated from any air-
> port parking facility located within the boundaries of the regional
> airport facility divided by the total number of cities within which a
> regional airport facility is wholly located.

[17] See also *Oakland Schools Bd of Ed v Superintendent of Public
Instruction*, 392 Mich 613, 620-621; 221 NW2d 345 (1974):

> The dynamics of the budget change from year to year on the
> basis of the revenues derived and the expenditures required by the
> people of Michigan. Responsible fiscal policy consequently also
> requires a yearly reassessment of revenues, spending goals and
> priorities.

and spent by the local government according to local fiscal policy.[18] Obviously, local taxes, levied by local governments, would not be subject to state appropriations or to legislative discretion in terms of revenue distribution.

Additionally, the act has a provision allowing assignment of payments from the revenues generated to locally incurred debt obligations of the county. The statute specifically provides that the act shall not be construed to "[r]equire the state to continue to impose and collect taxes imposed by this act [or] [l]imit or prohibit the state from repealing or amending this act." MCL 207.378(3)(a), (b); MSA 7.559(108)(3)(a), (b). In short, all indicia of the tax indicate prevailing state control.

Finally, while plaintiff contends that the tax is local because it benefits only local end users, we conclude that the tax clearly serves a state purpose.[19] The lan-

---

[18] Michigan is a home rule state. Home rule local governments are vested with general constitutional authority to act on all matters of local concern not forbidden by state law. See Ward, *A reformed Wayne County: The home rule charter*, 1981 Det Col L R 1013, 1014.

Counties were approved for home rule by the Michigan Constitution, art 7, §§ 1-16, as well as townships, art 7, § 17, and cities and villages, art 7, § 22. Charter counties, art 7, § 2, and cities and villages, art 7, § 21, have specific powers to levy taxes for public purpose. See also specific statutory authority, home rule cities, taxation authorization, MCL 117.3(f)-(i); MSA 5.2073(f)-(i). Charter counties have the power to levy and collect taxes, MCL 45.515; MSA 5.302(15), townships, the power to grant and vote money, MCL 41.3; MSA 5.3, and villages, the power to levy taxes for general expenses, MCL 69.1; MSA 5.1371.

Wayne County is a charter county. Wayne County Charter, § 1.112. Under the charter adopted by Wayne County, the general taxing authority of the county is specified in § 5.181. Ward, *supra* at 1030.

[19] The Legislature has apparently determined that an airport servicing a volume of traffic of four million or more annual enplanements imposes an incremental burden on local public services (of which Wayne County deputies positioned at metal detectors and the enforcement of Romeo parking ordinances are but obvious examples), and that it is reasonable that a

guage of the act is not exclusive, and its application is not limited to any one location. The act applies to parking facilities in any qualified county providing public services to a regional airport facility. Although Wayne County at present is the only county in Michigan that has an airport meeting the statutory definition, the statutory language does not restrict application of this tax to one locale as would the language of a local tax act.

To the extent that plaintiff suggests that the Legislature is allowed to impose taxes only for the purposes of state government, and not for purposes of local government, and that only a constitutional provision would allow for a diversion of state tax dollars to local governments, plaintiff is clearly incorrect. Excise taxes and other state taxes are distributed to local governments for local purposes under the Revenue Sharing Act, MCL 141.901; MSA 5.3194(401), as are state tax dollars under the gasoline tax act and other state taxes.[20]

---

business which directly benefits from such volume by providing parking facilities within a five-mile radius should defray part of the costs of a facility of unquestioned value to the state's economy. That this fiscal relief frees funds needed for indigent health care and essential county services does not negate the state purpose of the tax.

[20] The act's revenue sharing provisions direct payments from state income tax, MCL 206.1 to 206.499; MSA 7.557(101) to 7.557(1499), the sales tax, MCL 205.52; MSA 7.522, the intangibles tax, MCL 205.131; MSA 7.556(1), and the single business tax, MCL 208.1 to 208.136; MSA 7.558(1) to 7.558(136) to local units of government using a specific statutory formula. MCL 141.911 to 141.913; MSA 5.3194(411) to 5.3194(413). Thus, the state is, in fact, required to return to the local governments, a certain portion of its yearly revenue.

While it is true that the onus of collecting and remitting the tax to the state falls on the parking facility owner, this is certainly no different than any tax that is not paid directly to the state by an individual; for example, income tax is collected by employers, the sales tax by retailers, the use

Plaintiff's functional end-user argument ignores the fact that matters of local concern may also be matters of state concern. The determination of public purpose is preeminently a legislative prerogative. We have held that a purpose to stimulate the state's apple industry is beneficial to the general public, *Miller v State Apple Comm*, 296 Mich 248; 296 NW 245 (1941), and that the public financing of gubernatorial elections is for the general welfare of the public and well within the Legislature's power. *Advisory Opinion on Constitutionality of 1975 PA 227*, 396 Mich 465, 496-497; 242 NW2d 3 (1976).

In *Moreton v Secretary of State*, 240 Mich 584, 588; 216 NW 450 (1927), we found that the building and maintenance of public roads was not solely a matter of local concern. Rejecting the assertion that the gasoline tax, 1927 PA 150, now codified as MCL 207.101 *et seq.*; MSA 7.291 *et seq.*, was for the benefit only of the locality where the funds were expended, the Court found that the public interest divested the tax appropriation of its local character, and stated:

> To say that a highway appropriation is for local purposes means that it is for the benefit of the locality where it is expended. The purpose of these appropriations is not for the benefit of certain localities but for the State at large. . . . It is a general statute enacted for a State-wide purpose [and therefore] the act does not make appropriations for local purposes . . . . [*Id.* at 589-590.]

Like the gasoline tax revenues in *Moreton*, which were appropriated to certain local governments for highway maintenance and repair and which, in turn,

---

tax by consumers, and the property tax by municipalities. The tax itself, however, is not born directly by the parking facility.

benefited the entire driving public in the state, the revenue generated by the airport tax is allocated to those local governments that are involved in the provision of services to a major regional airport. Wayne County provides services to Metro, which itself serves as a hub for international, national, and regional airlines travel for the entire state.

In *Advisory Opinion*, we observed that the fact that certain individuals benefit from an appropriation does not necessarily imply that the appropriation is lacking a public purpose. The question is whether society at large has an interest in having those individuals benefited. *Id.* at 496.

Likewise, the fact that these defendants benefit from a state appropriation does not necessarily imply that the tax has only a local purpose. The state has an interest in the provision of services to a major regional airport, which has an obvious economic benefit to the state.

III

Relying almost exclusively on *Youngblood v Sexton*, 32 Mich 406; 20 AR 654 (1875), plaintiff asserts that the airport tax is a "local tax" because the monies collected pursuant to the tax come exclusively from the local parking businesses[21] and are subsequently distributed solely to Wayne County and Romulus on a monthly basis. Defendants contend that *Youngblood* is inapplicable, given the structure, requirements, and purpose of the Headlee Amendment, and that the tax is not a local tax. The relatively straightforward ques-

---

[21] See MCL 207.376; MSA 7.559(106). Funds accumulate in a special holding fund, the airport parking fund, created within the state treasury.

tion is whether *Youngblood v Sexton* requires the con-
clusion that this tax is a local tax as that term is used
in the Headlee Amendment. Because the Headlee
Amendment subjects local taxes and state taxation
and spending to distinct requirements, the simple
question has profound consequences.

The venerable holding of *Youngblood v Sexton*
rejected a challenge to a liquor tax imposed on liquor
dealers, payable to the city and collected by the local
sheriff. The Court concluded that the tax was a "local
specific tax," rather than a "state specific tax," and
therefore did not violate a provision of the then-
existing constitution. *Id.* at 413. That provision speci-
fied that proceeds from "state specific taxes"[22]
imposed by general law were to be applied to interest
on education funds and to interest and principal on
state debt.[23] The tax provided for in *Youngblood* was a
general tax that was collected within a particular

---

[22] *Shivel v Kent Co Treasurer*, 295 Mich 10, 16-17; 294 NW 78 (1940),
stated:

> "The legislature is given authority to impose specific taxes which
> shall be uniform upon the classes upon which they operate. . . . A
> specific tax is one which imposes a specific sum by the head or
> number, or by some standard of weight or measurement, and
> which requires no assessment beyond a listing and classification of
> the subjects to be taxed."

[23] The language of the 1850 Constitution is as follows:

Const 1850, art 14, § 1 provides "All specific state taxes, except those
received from the mining companies of the upper peninsula shall be
applied in paying the interest upon the primary school, university and
other educational funds and the interest and principal of the state debt in
the order herein recited . . . ." Article 14, § 10 further provides that
"[t]he state may continue to collect all specific taxes accruing to the trea-
sury under existing laws" and art 14, § 11 provides that "[t]he legislature
shall provide a uniform rule of taxation, except on property paying spe-
cific taxes, and taxes shall be levied on such property as shall be pre-
scribed by law . . . ."

locality and handed over to the local authorities, credited to the local contingent fund for purposes that the local authorities agreed upon, for the general purposes of local government. *Youngblood, supra* at 415. The Court noted that "any tax levied by a general law is a state tax; but if the moneys are to be put to local uses, the only substantial difference between that and one levied by local action, consists in this: that in one case the state levies the tax, and in the other [the state] authorizes the levy." *Id.* at 414.

Simply stated, under the 1850 Constitution, the state had the power to levy "state specific taxes" to support state government and the power to authorize the levy of "local specific taxes" to be collected by local governments for local purposes.[24] *Id.* at 413. We agree with defendant Wayne County's observation that the result in *Youngblood* is explained by the fact that, given the latitude to compel local taxation that was deemed not to be a state specific tax, the Court saw no need to classify specific taxes authorized by the state to be levied on local communities as anything but local taxes. In concluding that state specific taxes did not include taxes imposed by state law, but allocated to local units of government, *id.* at 413-414, the Court likewise avoided the constitutional requirement that all state taxes nominated as specific taxes be allocated to the reduction of the interest on either the education fund or the state debt because either local taxes locally imposed or state taxes compelled for a local purpose had the same effect.

---

[24] Additionally, municipalities had some power to levy their own local taxes. Ironically, the defendants in *Youngblood* argued that the state-authorized liquor tax was void as a local tax because the municipality had no voice in its levy and collection. *Youngblood, supra* at 414.

We disagree that *Youngblood* requires the result advocated by plaintiff for a fundamental reason: *Youngblood* was decided under the 1850 Constitution, which expressly permitted the state to impose tax revenues for purposes of local government. Under the current constitution, the state has no power to compel local governments to impose a new tax. See art 9, § 29. The resulting change in the relationship between the state and local governments mandated by Headlee, expressly precludes the *Youngblood* approach, thus removing the linchpin of plaintiff's analysis as it applies to state taxes not levied in lieu of property taxes.[25] As defendant Wayne County correctly notes:

---

[25] Plaintiff cites two tax opinions by the Attorney General to support its argument that the airport parking tax is a local tax. Such opinions are merely advisory and not precedential. The taxes in question are not new levies of state taxes and predate the Headlee Amendment. Both Attorney General opinions cite *Youngblood* as controlling. OAG, 1979, No 5,561, p 388 (September 17, 1979), concerns a three dollar tax on individual mobile homes, Trailer Coach Park Act, 1959 PA 243, MCL 125.1041; MSA 5.278(71), and OAG, 1980, No 5,729, p 846 (June 25, 1980), concerns a type of property tax on low grade iron ore, low grade iron ore tax, 1951 PA 77, MCL 211.621 *et seq.*; MSA 13.157(1) *et seq.*

In the same year that the Attorney General reported on the trailer coach park tax, another opinion regarding the Headlee Amendment, art 9, § 31, was discussed in OAG, 1979, No 5,562, p 389 (September 17, 1979). A cautionary note was injected into that report by this caveat. "[I]t should be noted that the Headlee Amendment represents a new departure in terms of a constitutional limitation on government taxing and spending. No Michigan court has yet addressed itself to interpreting the sections added by the adoption of this provision." *Id.* at 389-390.

The trailer coach park and iron ore taxes are distinguishable from the airport tax. The trailer coach park tax levied in lieu of local property taxes on individual mobile homes, which had been exempt from local property taxes.

Similarly, the iron ore tax is a form of property tax. It involves removing the land described as containing ore from the local township's property tax list and entering that land description onto a separate list.

The distinction which was meaningless in *Youngblood*, who "levied" the tax, has now become the foundation for determining whether approval of the local electorate is necessary before the tax may be collected.

## CONCLUSION

The Headlee Amendment makes the crucial inquiry, for purposes of analyzing tax limitations, the entity responsible for levying the tax. The claim that the recipient of the tax proceeds, rather than the entity levying the tax, determines whether the tax is state or local is refuted by the structure of the amendment and the structure of its purpose. Thus, accepting plaintiff's argument that the end-user recipient of tax proceeds determines whether a tax is state or local would have the negative effect of allowing the Legislature to classify taxes it appropriates to local units of government as local taxes and circumventing the state taxing cap, something the state is plainly precluded from doing under Headlee.[26]

We hold that the airport parking tax is a state tax authorized by state law, administered, collected, and distributed by the state. The Wayne County regional airport benefits the entire population of this state. Though the tax is currently allocated to Wayne County and Romulus, the language of the statute does not limit payments solely to these localities. The tax is not a local tax levied under the Headlee Amendment and, thus, is not subject to a vote by a majority of the electors of either of these local governments.

___

[26] Funding for courts established by the Legislature, Const 1963, art 6, § 1, would by this reasoning be a local tax when distributed to district courts and a state tax when distributed to circuit courts. MCL 600.9947; MSA 27A.9947.

We affirm the Court of Appeals conclusion that the airport parking tax is a state tax.

BRICKLEY, C.J., and RILEY, MALLETT, and WEAVER, JJ., concurred with BOYLE, J.

CAVANAGH, J. (*dissenting*). The issue is whether the Legislature may impose a tax on a specific activity in a specific location in order to generate revenue to assist financially the specific county and the specific municipality in which that activity occurs. In this case, I would hold that it may not. I dissent because I fail to see how the Legislature's purpose in relieving financially distressed Wayne County is reasonably related to imposing an excise tax on airport parking at private lots located solely in the Detroit Metropolitan Airport area. Accordingly, I would hold that the Airport Parking Tax Act, MCL 207.371 *et seq.*; MSA 7.559(101) *et seq.*, is unconstitutional under the Headlee Amendment, Const 1963, art 9, § 31,[1] because it was levied without local voter approval.

I

Generally, there are two means of interpreting a constitutional limitation on the government's authority to impose taxes. The first would be to determine whether the statute violates the literal language of Const 1963, art 9, § 31, which proscribes units of local government from levying or increasing taxes without voter approval. Under this approach, the airport parking tax arguably could be upheld under

---

[1] Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified . . . without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

Const 1963, art 9, § 31, because it was imposed by
the Legislature and not by a unit of local government.
The majority seems to reject this approach by stating
that "the entity imposing the tax in question may not
conclusively resolve the Headlee question." *Ante* at
534. If the majority is in fact rejecting this approach,
then I agree with it because this Court has long
looked beyond literal constitutional language. See,
e.g., *Lockwood v Comm'r of Revenue*, 357 Mich 517;
98 NW2d 753 (1959) (a legislatively imposed tax that
was styled as a use tax was held to be unconstitu-
tional as an improper sales tax).

Indeed, the proper approach is to look beyond form
to substance and to determine whether the practical
function of the tax violates the intent of the constitu-
tional provision. *Lockwood* explained:

> There is no middle ground. Either we construe the consti-
> tutional limitation literally or we construe it to accomplish
> its manifest objective and intent.
>
> Which is to be our choice? Actually, there is no choice
> but one. The unanimous opinion of this Court, written by
> Mr. Justice Cooley close to a hundred years ago, sets our
> course in its enunciation of immutable principles:
>
> "Constitutions do not change with the varying tides of
> public opinion and desire; the will of the people therein
> recorded is the same inflexible law until changed by their
> own deliberative action; and it cannot be permissible to the
> courts that in order to aid evasions and circumventions,
> they shall subject these instruments, which in the main only
> undertake to lay down broad general principles, to a literal
> and technical construction, as if they were great public ene-
> mies standing in the way of progress, and the duty of every
> good citizen was to get around their provisions whenever
> practicable, and give them a damaging thrust whenever con-
> venient. They must construe them as the people did in their

adoption, if the means of arriving at that construction are
within their power."

*     *     *

The literal construction of the words, without regard to
their obvious purpose of protection, is to make the consti-
tutional safeguard no more than a shabby hoax, a barrier of
words, easily destroyed by other words. This canon of con-
stitutional construction we reject. A constitutional limita-
tion must be construed to effectuate, not to abolish, the
protection sought by it to be afforded. [*Id.* at 554-557 (cita-
tion omitted).]

Although the majority seems to be applying this
approach, I believe that it is choosing to ignore the
realities of who benefits from the tax revenue gener-
ated, the means and the extent to which the tax is
limited in the scope of its applicability, and how the
two provisions are wholly unrelated.

II

Although this is the first time that we have consid-
ered whether a statutory tax is really a local tax for
purposes of a Headlee Amendment challenge, the law
is replete with cases determining whether statutory
taxes based on classifications[2] are local or state taxes
under various state constitutional provisions. See
anno: *Validity of statutory classifications based on*

---

[2] The airport parking tax statute applies to private parking within five
miles of "an airport that services 4,000,000 or more enplanements annu-
ally." MCL 207.372(h); MSA 7.559(102)(h). I believe this enplanement
classification functions much like a population classification, which is a
device often used by state legislatures. However, it has long been recog-
nized that population classifications can be used "as a mere cloak for
local laws . . . ." *Birmingham Electric Co v Harry*, 215 Ala 458, 458; 111
So 41 (1926).

*population—Tax statutes,* 98 ALR3d 1083.[3] The Headlee Amendment shares a common theme with other constitutional provisions.

In *Durant v State Bd of Ed,* 424 Mich 364, 383; 381 NW2d 662 (1985), this Court described the purpose of the Headlee Amendment:

> [The voters] were striving to gain more control over their own level of taxing and over the expenditures of the state. It is evident that while the voters were concerned about the general level of state taxation, they were also concerned with ensuring control of local funding and taxation by the people most affected, the local taxpayers. The Headlee Amendment is the voters' effort to link funding, taxes, and control.

The goal of local control underlying the Headlee Amendment parallels the people's intent underlying Const 1963, art 4, § 29, which provides:

> The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected.

---

[3] In those cases involving the issue of whether a population classification contained in a tax statute renders such a statute invalid, the courts have discussed a variety of different grounds of attack upon such a statute. One frequent argument as to the validity of such statutes has concerned state constitutional provisions prohibiting local or special laws, either altogether or in certain cases only and subject to certain qualifications and exceptions. Generally, it appears well settled that a statute under which counties or municipalities are classified on the basis of population does not fall within a constitutional inhibition against local or special laws, where the classification has reasonable relation to the purposes and objects of the legislation. [*Id.* at 1087.]

Chief Justice KAVANAGH explained the historical purpose underlying Const 1963, art 4, § 29, in *Advisory Opinion on Constitutionality of 1975 PA 301,* 400 Mich 270, 286-287; 254 NW2d 528 (1977):

> The history and rationale of this provision, which first appeared in the Constitution of 1908, was set forth by Justice BROOKE in *Attorney General ex rel Dingeman v Lacy,* 180 Mich 329, 337-338; 146 NW 871 (1914):
>
> "Considering the history of legislation under the Constitution of 1850, it is apparent that there had grown up a pernicious practice on the part of the legislature in passing local acts. The practice was bad in two very important particulars. In the first place, much of the legislation thus enacted constituted a direct and unwarranted interference in purely local affairs and an invasion of the principles of local self-government. In the second place, such legislation affecting as it did certain limited localities in the State, the senators and representatives from unaffected districts were usually complaisant, and agreed to its enactment without the exercise of that intelligence and judgment which all legislation is entitled to receive from all the members of the legislature. This course led to many abuses (principally in amendments to city charters), some of which found their way into the courts, and were there redressed so far as the Constitution then in force would permit.
>
> "With these evils in mind, the Constitution of 1909 [sic] was formulated and adopted by the people. From a reading of the provisions above quoted and others of a similar character, it is, we think, entirely clear that it was the settled purpose of the framers of the new instrument and of the people who adopted it to forever insure to the people the right to control their affairs purely local, and to secure for all general legislation grave attention and the application of the collective wisdom of the legislators."

Given the analogous purposes underlying the Headlee Amendment and Const 1963, art 4, § 29, I believe we should approach the instant case in the

same manner that this Court has approached a Const
1963, art 4, § 29 challenge. Under that provision, the
challenge has been that a facially neutral statute,
which in practicality only applied to Wayne County or
Detroit, was really an unconstitutional local act. The
test this Court has used was summarized in *Dearborn
v Wayne Co Bd of Supervisors*, 275 Mich 151, 155-156;
266 NW 304 (1936):

> The legislature has enacted a number of laws upon a pop-
> ulation basis and without referendum requirement, which,
> *in præsenti*, could apply only to the county of Wayne or the
> city of Detroit. Some of them have been before this court.
> The principles upon which they have been sustained as gen-
> eral laws or defeated as local acts are well established in
> this State and elsewhere.
>
> The first test to be applied is whether population has a
> reasonable relation to the purpose of the statute. In *Mulloy
> v Wayne Co Bd of Supervisors*, 246 Mich 632, 635 [225 NW
> 615 (1929)], the distinction is pointed out:
>
> "Clearly, because of its provision as to population, the act
> applies to Wayne county only. If it is a reasonable and logi-
> cal basis of classification, considering the subject of legisla-
> tion, unquestionably a specified population may be made
> the test of the applicability of a general legislative act; and
> under such conditions the act will not be construed to be
> invalid as local legislation. But where the subject of legisla-
> tion is such that population has no obvious relation to the
> purpose sought to be accomplished, an attempt to make the
> application of the legislative act dependent on population is
> unwarranted and amounts to local legislation. *Attorney
> General ex rel Dingeman v Lacy*, 180 Mich 329."
>
> *         *         *
>
> The second test of a general law, based upon population,
> is that it shall apply to all other municipalities if and when
> they attain the statutory population. It must have—"an open
> end through which cities are automatically brought within

its operation when they attain the required population."
[Citations omitted.]

This Court reaffirmed the *Dingeman v Lacy* test in
*Avis Rent-A-Car System, Inc v City of Romulus*, 400
Mich 337; 254 NW2d 555 (1977), a case factually simi-
lar to the instant case. There, the Avis and Hertz
rental car companies had received grants of conces-
sions at Detroit Metropolitan Airport pursuant to MCL
259.133; MSA 10.233. They also had leased land from
the airport and had built service buildings. 1953 PA
189 related to taxing lessees of what would otherwise
be tax-exempt property (owned by the airport). The
act provided an exception for concessions at public
airports that were available for general public usage.
Romulus tried to tax Avis and Hertz for their use of
the land at the airport, but lost in suits brought by the
companies. Romulus then sought the assistance of
the Legislature, which passed 1970 PA 174, limiting
the exception to concessions at airports "only in
'counties of over 1,000,000.'" *Avis*, 400 Mich 343,
quoting 1970 PA 174. The Court restated the long-
standing rule:

> [A] population classification "must have a reasonable
> relation to the subject matter of the legislation, and must
> furnish some fairly apparent reason for legislation differing
> from that applicable to other municipalities having a sub-
> stantial difference in population." A population classifica-
> tion "can never be sustained where it is, as in the case at
> bar, a manifest subterfuge." [*Id.* at 345.]

The *Avis* Court held that the 1,000,000 population
limitation was unconstitutional. It reasoned:

> 1970 PA 174 limits the application of the tax exemption
> granted by 1953 PA 189 by requiring the concessionaire to

meet "basic tests." This is appropriate. However, the legislation has a discriminatory thrust. It is applicable only to airports and only to airports in counties with more than 1,000,000. We require that a reasonable relationship between those qualifications and the limiting of a tax exemption be demonstrated. It has not been demonstrated in this case.

The legislative purpose in 1970 PA 174 was to withdraw a tax exemption from concessions at airports located in counties over 1,000,000 people (only Wayne County). The legislative conclusion must have been that these airports will attract concessions without the lure of a tax exemption. The attraction, however, is not a function of county population. It depends on the volume of traffic flowing through the airport. Under this legislation, the exemption is withdrawn not only from concessions at Metro but also could apply to the other two Wayne County airports—Detroit City and Grosse Ile Municipal Airport. It is difficult to "reconcile the legislative intent . . . with the legislative scheme."

*          *          *

The trial court in *Hertz* noted that the defendants had supplied "figures on enplanement and deplanements which show that the overwhelming majority of Michigan's passenger air traffic takes place at Metropolitan Airport." Defendants said this was because Metro "is in the state's most populous county." The court said that the airport traffic was not related to or dependent on Wayne County's population. The trial court in *Avis* said "there is no correlation between the county in which an airport is located and the traffic which passes through the airport."

We do not see a reasonable relationship between the withdrawing of a tax exemption from airport concessions and the size of the county where the airport is located. We believe the legislation is a local act in an area where a general act could be made applicable. [*Id.* at 347-348.]

The reasonable-relationship test has long been used by many state courts with respect to determining

whether a statute with a population classification was really a local act or local tax.[4] Such statutes have been sustained where the court found a rational reason for not extending the statute to less populated municipalities. *Alexander v Chicago*, 14 Ill 2d 261, 268; 151 NE2d 319 (1958) (population density was found to be rationally related to park maintenance and services); *Hassler v Engberg*, 233 Minn 487, 513-514; 48 NW2d 343 (1951) (population density and proximity of buildings may affect fire risks). In contrast, similar statutes have been struck down where the court did not find such a reason. *Sivort Co v State*, 136 Fla 179, 184; 186 So 671 (1939) ("the basis for the attempted classification finds no reasonable justification in connection with the subject matter of the Act"). *Koons v Atlantic City Bd of Comm'rs*, 134 NJL 329, 332-333; 47 A2d 589 (1946), explained:

> [T]he law-making authority may subdivide the common-law municipalities into subordinate classes; and the validity of such legislative classification depends upon the existence of distinguishing qualities and attributes related to the subject matter of the legislation. The characteristic constituting the basis of the classification must be reasonably appropriate to the object of the law. Unless it rests upon distinctions that are substantial and not merely illusory, the classification is wanting in the virtue of constitutional generality. The test is whether the statutory class has a logical and reasonable basis, free from artificiality and arbitrariness, embracing all and omitting none naturally falling into that category. Is

---

[4] See, e.g., *Miller v El Paso Co*, 136 Tex 370, 375; 150 SW2d 1000 (1941):

> Resort to population brackets for the purpose of classifying subjects for legislation is permissible where the spread of population is broad enough to include or segregate a substantial class, and where the population bears some real relation to the subject of legislation and affords a fair basis for the classification.

the legislation of such a character as that it is equally appropriate to all forming the statutory class, and is that class embracive of all in like situation and circumstances, and therefore natural members of the class? If, viewed in the light of the legislative design, the necessity and propriety of the classification reasonably appears, it is not within the constitutional interdict.

*Green v Arlington Co Bd*, 193 Va 284, 287-288; 68 SE2d 516 (1952), echoed a similar test:

The test of reasonableness of classification is said to be whether it embraces all of the classes to which it relates. The basis of the classification involved must have a direct relation to the purpose of the law, and must present a distinction which renders one class, in truth, distinct or different from another class. . . . Laws may be said to apply to a class only, and that class may be in point of fact a small one, provided the classification itself be a reasonable and not an arbitrary one, and the law be made to apply to all of the persons belonging to the class without distinction. [Citation and internal quotations omitted.]

These cases would support a two-pronged test for determining whether the instant enplanement classification is a cloaked local tax: (1) the classification must be open-ended so that other counties, municipalities, and airports, in a situation similar to that which is the aim of the statute, fall within the class, and (2) the classification itself must bear a reasonable relationship to the purpose of the statute. I turn first to the relationship between the Legislature's purpose in enacting the Airport Parking Tax Act and the number of passengers enplaning at Detroit Metropolitan Airport.

III

The airport parking tax was part of a package of bills aimed at addressing Wayne County's financial situation, *at Wayne County's request.* House Legislative Analysis, HB 5164, 5166, 5168, 5170, 5171, 5198-5200 (January 22, 1988). The problem that the Legislature was seeking to address was described as follows:

> Wayne County is seeking the state's help with its massive budget problems. County officials, faced with the possibility of bankruptcy, are threatening drastic cuts and layoffs in essential services, such as law enforcement, health care, libraries, and parks. The county is contemplating closing a floor of the county jail and cutting the prosecutor's staff, moves that would frustrate anti-drug trafficking efforts just underway. According to House Taxation Committee staff reports, Wayne County owes the state $49 million from a debt settlement agreement in 1984 and some $60 million accumulated since then. A $15 million shortfall is expected in the 1988 resident county hospitalization (RCH) budget. Another $52-72 million is owed to non-state sources (e.g., tax anticipation notes issued to meet payroll). The county's budget has a recurring $10 million operating deficit. The causes of the problems are manifold and complex, but there is little doubt that the cost of providing health care to indigents is a major contributor to the county's fiscal woes. The RCH program was expected to cost $32 million this year (slightly over $19 million to be paid by the state), but instead will cost about $50 million! (Wayne County officials say the second largest RCH program, in Oakland County, cost $2.5 million.) Alone among Michigan's counties, Wayne County is required to run an open-ended indigent health care program where demand determines costs. While the county needs long-term budget reforms, including a way to control health care costs, and new sources of revenue with growth potential, it also needs immediate relief from its overwhelming difficulties. [*Id.* at 1.]

The legislative history reveals that the revenue from the airport parking tax was generated to help Wayne County avoid financial disaster. I would fully agree that the state has a vital interest in Wayne County's financial stability. But, "[a] laudable purpose does not validate unconstitutional means." *Dearborn*, 275 Mich 158.

I find that none of the described problems that the Legislature sought to address are related to Detroit Metropolitan Airport parking. Indigent health care costs, which are a function of the number of indigent residents, are *wholly unconnected* to the volume of passengers enplaning at Detroit Metropolitan Airport, just as the volume of concessions at an airport is unrelated to the population of the county in which the airport sits. *Avis*, 400 Mich 348. I do not believe that the majority can genuinely say that this airport parking tax serves a state purpose related to serving a major airport.[5]

Further, the statute provides:

(1) Beginning January 1, 1988, through December 31, 1988, on the first day of each month, the state treasurer shall make a distribution from the fund to each qualified county in an amount equal to the total amount on deposit in the fund multiplied by a fraction the numerator of which is *the population of that qualified county* during the immedi-

---

[5] To further underscore that the airport parking tax is not a function of maintaining an airport, I note that the statute provides:

The distribution received by a qualified county under this act *does not constitute revenue from the use or operation of the airport* located within that county and is not subject to any pledge of, lien upon, or use restriction of revenue received or derived by that county from the use or operation of that airport. [MCL 207.382; MSA 7.559(112) (emphasis added).]

ately preceding year and the denominator of which is *the
total population of all qualified counties* during the imme-
diately preceding year.

(2) Beginning January 1, 1989, on the first day of each
month, the state treasurer shall make a distribution from
the fund to each city within which a regional airport facility
is wholly located in an amount equal to 20% of the total
amount on deposit in the fund minus the amount of reve-
nue generated from any airport parking facility located
within the boundaries of the regional airport facility divided
by the total number of cities within which a regional airport
facility is wholly located. Any surplus funds remaining after
the distribution *shall be distributed in accordance with (1)
above.* After the distribution is made under subsection (1),
on the first day of each month, the state treasurer shall
make a distribution from the fund to each qualified county
in an amount equal to the total amount on deposit in the
fund after the distribution under subsection (1).

(3) A distribution made under subsection (1) or (2) shall
be deposited in *the general fund* of the city or qualified
county.

(4) The distribution provided by subsection (2) shall not
be made if all taxing units are authorized by law to impose
taxes and the collection is made of taxes imposed under
Act No. 189 of the Public Acts of 1953, being sections
211.181 to 211.182 of the Michigan Compiled Laws, on con-
cessions at a regional airport facility. [MCL 207.377; MSA
7.559(107) (emphasis added).][6]

The money is in no way earmarked for maintaining
the airport that produced the parking that is the sub-
ject of the tax. Instead, it is distributed to Wayne
County's and Romulus' general funds. Moreover,
assuming arguendo that another county or city could
ever qualify under the statute, the amount that would

---

[6] MCL 211.181; MSA 7.7(5) applies to lessees or users of tax-exempt
property: i.e., the rental car parking lots operating on public airport
property.

be distributed would be a function of *the population* of the county—not the number *of enplanements*. Similarly, the amount distributed to qualified cities would be a function of both *the number* of cities and of their populations—again, not the number of enplanements.

In any event, by design, the Legislature intentionally drafted the airport parking tax statute to apply only to parking in the Detroit Metropolitan area.[7] Yet, even if the majority was correct that Wayne County's financial distress was related to serving its airports,[8] there is no apparent reason for excluding from the

---

[7] *House Bill 5170* would create, effective January 1, 1988, an excise tax on the operators of airport parking facilities at the rate of 30 percent of the charge for parking. *(The tax would apply only to Detroit Metropolitan Airport.)* Parking facilities within the boundaries of the airport or within five miles of the boundaries would be subject to the tax. The revenue would go to a special state fund and be distributed monthly. During 1988, the distributions would go entirely to Wayne County. As of 1989, 20 percent would go to the city in which the airport is located (Romulus) and the remainder to the county. A county could assign or pledge some or all of its portion to pay off obligations under the Fiscal Stabilization Act or Shared Credit Rating Act. The distribution to the city would not be made if the city is collecting taxes on airport concessions under Public Act 189 of 1953. [House Analysis, *supra* at 3 (emphasis added).]

[8] The majority finds that the airport parking tax is a state tax because it is "styled as a state tax, has the structural attributes of a state tax, and serves a state purpose." *Ante* at 535. I agree with the majority that this tax "looks" like a state tax, in that it was passed by the Legislature, that it facially appears to apply to all qualified counties and municipalities, and that it is administered by a state collection entity. However, the majority has "conclude[d] that the tax clearly serves a state purpose," *id.* at 537, without specifying what that "clear" state purpose is. The majority seems to suggest that the revenue is intended to support counties and cities in providing services to major airports. *Id.* at 539-540. If that were true, then I would agree that an airport parking tax would have a valid state purpose because the state has a strong interest in maintaining airports. However, the revenue generated by the airport parking tax does not go to servicing airports. The revenue goes directly into nonearmarked general funds.

taxed class the private parking facilities at airports in Wayne County other than Detroit Metropolitan Airport.

In contrast to the majority's analysis, *Lockwood* would have us apply an "acid test" to the airport parking tax:

> When we put these taxing acts, as we must, to the acid test of examination in terms of their "practical operation," when we, again as is our duty, "look through forms and behind labels to substance," what do we find? [*Id.* at 558.]

I find the following. The Legislature wanted to provide Wayne County with financial assistance, *at Wayne County's request*. However, to do so directly would require two-thirds approval by both houses of the Legislature.[9] Under the pre-Headlee Amendment constitution, the Legislature could not levy a local tax without two-thirds approval of both houses. Const 1963, art 4, § 29. Under the Headlee Amendment, Wayne County itself could not have imposed a local tax without direct voter approval. Const 1963, art 9, § 31. Therefore, in an attempt to circumvent the requirements of local voter approval and two-thirds approval of both houses, the Legislature drafted a tax classification scheme based on enplanements. Applying the acid test of examination to this tax, I would find a manifest subterfuge by which the Legislature sought to raise money for a local purpose. Moreover, the means chosen are not rationally related to the budgetary problems faced by Wayne County. Further, even if there were a rational connection, the enplane-

---

[9] Const 1963, art 4, § 30 requires local appropriations to be approved by two-thirds of both houses of the Legislature.

ment classification has excluded private parking at other airports that would seem to naturally fall within the burden of a county and city providing services to airports. As such, I find that the classification itself is arbitrary.

Absent a reasonable relation between the purpose of the tax and the classification employed for imposing the tax, the tax cannot be held to have a constitutional state purpose. By upholding this tax, the majority has created a loophole, that is, an opening through which the intent of the drafters of the constitution and of the people adopting the Headlee Amendment in protecting local control over local concerns can be defeated.

IV

I would hold that this tax is unconstitutional in violation of the Headlee Amendment's purpose of ensuring local taxpayer control over local taxes. I would reverse the decision of the Court of Appeals.

LEVIN, J., concurred with CAVANAGH, J.